253 So.2d 237 (1971)
Kitty RILEY, wife of/and Samuel Riley
v.
Jose FRANTZ, Individually and as Administrator of the Estate of his minor son, Richard Frantz, et al.
No. 4559.
Court of Appeal of Louisiana, Fourth Circuit.
October 6, 1971.
*238 Garvey, Salvaggio & Prendergast, John A. Salvaggio, New Orleans, for plaintiff-appellees.
Drury, Lozes & Curry, H. Edward Weidlich, Jr., New Orleans, for defendants-appellants.
Before LEMMON, GULOTTA and BOUTALL, JJ.
BOUTALL, Judge.
This is a suit for personal injuries and other damages as the result of a two-car collision. The plaintiffs are husband and wife. The husband institutes this suit for personal injuries and special damages, the wife seeks recovery for her personal injuries. The defendants are Jose Frantz, individually and as administrator of the estate of his minor son, Richard Frantz (driver of the defendant vehicle); Betty Nelson, owner of the defendant vehicle, and her liability insurer, Allstate Insurance Company.
*239 The accident occurred on January 6, 1968, at approximately 8:00 P.M. at the intersection of Dauphine and St. Philip Streets in New Orleans, Louisiana. The plaintiff vehicle, being driven by Samuel Riley, was proceeding in an uptown or upriver direction on the favored street (Dauphine Street). After entering the intersection (of Dauphine at St. Philip Streets), plaintiffs' vehicle was struck from the right side by an automobile traveling toward the Mississippi River on St. Philip Street. The driver of the defendant vehicle was Richard Frantz, who was operating the said vehicle with the owner's permission.
After trial on the merits, there was judgment against the defendants in solido in favor of Mr. Riley in the amount of $7,314.50 ($4,500.00 general damages and $2,814.50 special damages), and in favor of Mrs. Riley in the amount of $6,000.00. From this adverse judgment defendants have prosecuted this appeal.
This appeal is limited to the following defense contentions: (1) The awards to Mr. and Mrs. Riley for their respective personal injuries are grossly excessive; and (2) Portions of the award to Mr. Riley, as head and master of the community, should be deleted as they are not recoverable according to the law and jurisprudence of Louisiana.
Testimony pertinent to the issues before us was given by plaintiffs and five medical experts (three by way of deposition), all called by the plaintiffs.
1. Mrs. Kitty Riley's personal injuries.
The first physician to see Mrs. Kitty Riley was Dr. Morris Levy, a general surgeon, who examined this plaintiff in the emergency room of Touro Infirmary shortly after the accident on January 6, 1968. In the history taken in the emergency room, this plaintiff stated that she had pains in the right side of the neck and on the right side of her head which had been struck against the windshield. The doctor's positive findings were a tender area of the lateral aspect of the left thigh and tenderness of the right sternocleidomastoideus or neck muscle. At this time, Dr. Levy was under the impression that Mrs. Riley had a severe sprain of the neck with contusions and tenderness in the right side of her neck and left thigh.
The next day Mrs. Riley returned to the emergency room complaining of a great deal of pain. The staff at the hospital contacted Dr. Levy who, in turn, ordered an injection be given the patient for pain. Two days after the accident, Dr. Levy had occasion to again examine Mrs. Riley, this time at his office. During this examination, the plaintiff complained of pain across the upper abdomen and in the right armpit. Dr. Levy found some tenderness relative to her abdominal pain and noted some tenderness in the right armpit about the level of the third rib. For this, the doctor prescribed a mild sedative and muscle relaxant.
Again, on January 12, Dr. Levy saw the patient, who was now complaining of dizziness, nausea and more abdominal soreness. This time he found no tenderness in the abdominal area but observed tenderness in both rib cages and along the back of the neck in the area called the neutral line (the ligament that goes up and down the center of the spine in the cervical area). Dr. Levy concluded that it was not unusual to have lumps, bruises, nausea or dizziness two or three days after an accident and that these symptoms would probably suggest a post-concussion syndrome. Medication at this point was a combination muscle relaxant-tranquilizer drug due to the patient's nervous and anxious condition.
The last time that Dr. Morris Levy consulted with Mrs. Riley was on January 19, 1968. Dr. Levy felt that plaintiff's "complaints were rather peculiar in the sense that she complained of having nightmares, that she'd go to sleep and when she'd wake *240 up she couldn't speak, no words would come out of her mouth". At this juncture, his examination being negative, he recommended that Mrs. Riley consult a neurosurgeon.
Dr. Levy testified that the report of the neurosurgeon, indicating a mild concussion, was compatible with his own findings and observations. He also stated under examination that he felt the patient had developed an anxiety state as his physical findings were within normal limits and that there was most probably an emotional basis for the patient's symptoms which he related to the automobile accident. In his opinion he would not have discharged the patient had she remained in New Orleans (Mr. and Mrs. Riley at the time of the accident were on vacation from California, visiting relatives in New Orleans) and felt that she could certainly not return to her former employment as a domestic while he was treating her.
Upon Dr. Morris Levy's recommendation, Mrs. Riley consulted Dr. Richard Levy, a neurosurgeon in New Orleans, on January 24, 1968. Dr. Levy testified that in his opinion there was no doubt that the plaintiff had a mild concussion as well as a neck and right shoulder injury resulting from this accident. Under further examination, Dr. Levy agreed that the plaintiff's complaints of headache and dizziness and her inability to return to work were compatible with his own findings. Dr. Levy testified that he informed the patient that the headaches and dizziness might continue from several weeks to several months and that there was nothing she nor anyone else with a mild concussion could do to relieve the post-concussion symptoms of headaches, dizziness, blurred vision and so forth except to wait until the symptoms disappeared by themselves.
In response to defendants' contention that Dr. Levy described Mrs. Riley's dizziness as "light-headedness", the plaintiffs submit that Dr. Levy adequately explained his diagnosis:
"No, I don't want to give the impression that it's a momentary type of dizziness. I think that a person could move about cautiously but it isn't something that simply comes for the moment that one arises or looks up or stoops over, it does hang on for several minutes."
Upon Mrs. Riley's return to her home in Los Angeles, she consulted Dr. Kaspar Fuchs, a neurosurgeon, whose findings indicated that there was a questionable change of the cervical curve, a straightening, which could be compatible with cervical muscular spasm. He diagnosed Mrs. Riley's neurological condition as possibly a post-concussional syndrome, albeit, there was not a direct history of loss of consciousness. Dr. Fuchs also stated that the problems related by Mrs. Riley could be the result of emotional instability which is a fairly common symptom in people who have suffered a concussion.
Mrs. Riley testified that she recalled that upon impact there was a jerking and that her head hit the windshield and that for a few minutes she couldn't remember anything but did realize that she had glass in her face. After the accident she tried to relate her condition to her husband but found that she was unable to speak. Mrs. Riley described that her body broke out in small bumps which she understood to have been related to her nervous condition. She stated that the only relief she really got was when she remained in bed. Mrs. Riley further testified that she became hysterical about having to leave her children in New Orleans (these circumstances to be discussed, infra) and that she had never been separated from her children previously. Mrs. Riley's testimony concerning her employment is that up to the time of this accident she worked steadily as a domestic five days a week at an average earning of $15.00 per day.
She testified to 31 specific work days (for five employers) on which she could *241 not work and informed the court that there were other days she missed for other employers but she could not substantiate this. She further testified that, although she was feeling better at the end of three months following the accident, she was still not all right at the time of the trial. Prior to this accident she had only suffered the usual illnesses. Although she had never taken nerve medication before in her life, she was at the time of trial still on nerve medication and she was still a very nervous person. When questioned by the court, concerning her nervous condition, Mrs. Riley explained that she has never been the same since the time of the accident, that sometimes she gets so nervous she gets welts on her body, and sometimes she just gets a dizzy feeling like she is "going to blank out".
A fair summation of the testimony of the above three experts is corroborative of the complaints and testimony of Mrs. Riley. The findings are substantially consistent in that Mrs. Riley suffered a neck injury, a contusion of the right thigh and a cerebral concussion with subsequent emotional instability which these physicians related to the accident of January 6, 1968.
The trial court was of the opinion that the medical testimony was uncontroverted. This court's review of the lower court transcript substantiates the findings of the trial judge as they relate to Mrs. Kitty Riley's personal injuries.
The defendants urge to us that the award of $6,000.00 to Mrs. Riley for her personal injuries constitutes an abuse of the discretion of the trial court, citing numerous cases which granted lesser amounts for similar injuries.
It is a most strong tenet in the law of this state and its jurisprudential holdings that, on appellate review, the trier of fact's award of general damages should not be disturbed unless there is a finding in the appellate court that the trial judge has abused its vast discretion, after taking into consideration that each personal injury must be evaluated according to its own peculiar facts and circumstances. LSA-C.C. art. 1934(3); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967); Ballard v. National Indemnity Company, 246 La. 963, 169 So.2d 64 (1964); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963).
The Court of Appeal in Fish v. Martin, 201 So.2d 341, 343 (La.App.3rd Cir. 1967) held:
"* * * that prior awards for seemingly similar injuries are relevant only insofar as they may indicate that the present award is so greatly out of proportion with them as to indicate a possible abuse of the trial court's great discretion. Also, the appellate court should take into consideration that it is principally the function of the fact-trier to evaluate the credibility of an injured person's complaints as to the magnitude and duration of the residual pain. * * *" (Italics ours)
The Supreme Court in the recent case entitled Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971) stated that in Lomenick v. Schoeffler, supra, and the cases cited therein,
"* * * this Court undertook to reemphasize the codal provision in a series of pronouncements designed to make clear to the intermediate courts of appeal the vitality of the codal approach to the review of damage awards." (246 So.2d 18)
* * * * * *
"From these decisions, two principles emerge: (1) To modify the amount of an award for general damages, an appellate court must find that the trial judge or jury has abused the `much discretion' accorded by the codal provision; (2) The awards in other cases serve only as an aid in determining whether there has *242 been an abuse of discretion and rivet no steel frame of uniformity.
Applying these principles to a personal injury award often presents real difficulty. The facts relating to the injuries must be collated in each case. Upon these facts, the Court must focus an informed judgment, tempered by a fair recognition of the discretion vested in the trial judge or jury." (246 So.2d 19)
Our appreciation of the law and the facts does not disclose an abuse of discretion by the trier of fact in the instant case in its award of $6,000.00 in general damages to Mrs. Riley.
2. Mr. Samuel Riley's personal injuries.
Mr. Riley was seen by Dr. Morris Levy on January 12, 1968, at the doctor's office relative to the personal injuries he sustained in the accident of January 6, 1968. This plaintiff related to Dr. Levy that on the day following the accident he experienced pain behind his head and down his neck. Two days following the accident this pain reached down his entire back. Dr. Levy's examination revealed a tenderness down the center of the cervical spine, across the lower back and in the right sacroiliac joint region. This doctor's impression at the first examination was that Samuel Riley had a cervical and lumbosacral spine sprain which he related to the accident. The medication prescribed was a muscle relaxant-tranquilizer.
The next time Dr. Levy was consulted by Samuel Riley was on January 19, 1968, for essentially the same complaints that he related to Dr. Levy on January 12, except that he experienced pain when he performed the motions the doctor requested of him. At this visit his medication was changed to a drug to combat inflammation in his muscles and ligaments. Dr. Levy testified that he recommended to Mr. Riley that he consult his own physician upon returning home. This doctor's testimony is that the last time he examined Mr. Riley he still had positive findings and had he remained in New Orleans he would have continued to treat him.
After returning to Los Angeles, Samuel Riley consulted Dr. Donald Holcomb, a general surgeon, who testified by way of deposition. Mr. Riley's complaints referred to the cervical and lumbar regions and Dr. Holcomb's findings were a cervical and lumbar strain. This physician's diagnosis also disclosed a limitation of motion in both the cervical and lumbar regions as well as tenderness in both sets of muscles. The range of all cervical motion was limited by 15 degrees and that lumbar flexion was limited to 45 degrees, whereas it would usually be in the range of 80 to 90 degrees. The course of treatment prescribed was hot compresses and hot baths. When questioned as to why he prescribed no medication, the doctor stated that the patient had apparently been taking Librium and because of a skin rash on his upper extremities, Dr. Holcomb discontinued this drug, on the probable basis that this rash was a drug reaction and because of this he prescribed nothing else. On the second visit, February 7, 1968, Dr. Holcomb testified that his notes indicated that the patient was improving but still in considerable pain in the cervical and lumbar regions. Samuel Riley was again seen on February 14, 1968, at which time Dr. Holcomb prescribed an analgesic to make him more comfortable. At that time he was further improved with discomfort mostly in the right side of the back. On February 21, Dr. Holcomb recommended physiotherapy consisting of heat and exercises of the lumbar spine.
When seen on February 28th he was still complaining of back pain. However on March 6th he was found to be improved, and, at this time, it was noted by Dr. Holcomb that he would be permitted to return to work on March 11th. However, this period of disability was later extended with the notation by the doctor that he was not to return to work until March 22nd. When seen on April 12th Mr. Riley complained of recurring cervical and lumbar discomfort *243 after having returned to work for a brief period of time.
Mr. Riley returned to Dr. Holcomb on October 17, 1968, at which time a diagnosis of lumbar strain was again made and Dr. Holcomb prescribed a new medication and told Mr. Riley to use a board under his mattress for sleeping and to use hot baths.
In February of 1969, more than a year after the accident, Mr. Riley had to return again to Dr. Holcomb, and, this time, Dr. Holcomb noted that he was still having back distress and that there were some tender lumbar muscles and because Mr. Riley was getting relief from Darvon he was given a new prescription for this drug.
Dr. Holcomb made it absolutely clear that all of these visits were occasioned by this accident and were directly related to the original trauma. When asked at the time of the deposition about Mr. Riley's present complaints, he testified that it was conceivable that these present complaints could relate back to the accident. When questioned about previous back complaints in the year of 1965, Dr. Holcomb testified that he did not feel they were significant and he would discount them with reference to the accident of January 6, 1968.
Dr. Holcomb testified that exacerbations and remissions are not uncommon in this type of injury and that it is not uncommon to have these complaints and not have basic objective findings to support them.
Mr. Riley was referred to Dr. Walter Stiess on March 30, 1969, because of complaints of pain in his leg. Dr. Stiess decided to do a laboratory work-up to determine whether or not there was an arthritic problem involved. The laboratory tests were normal but Dr. Steiss concluded that there must have been some type of arthritis or gout and prescribed a drug, Indocin, which is usually given to gout patients. When Mr. Riley was seen by Dr. Steiss on April 27th, he stated he felt much better, and on March 1, 1970, because of complaints of continuous backache he was advised to remain on Indocin. Yet the doctor never actually says that Mr. Riley had gout but merely states that he could have either gout or arthritis and that the only thing that makes him lean towards such a diagnosis was the fact the Mr. Riley was improving on the Indocin. However, Dr. Stiess further stated that if Mr. Riley did have arthritis, that it could have been aggravated by trauma or that trauma could be delayed in healing with the presence of arthritis in the system. As to this last point, the trial court concluded that Mr. Riley's arthritis or gout has no connection whatsoever to the accident in question nor were these conditions aggravated by said accident.
The trial court found that Samuel Riley sustained a lumbar sacral sprain and strain and a cervical sprain and strain of a moderate nature, which remained with him some 13 months, which injuries necessitated him to be away from his employment for 61 days (Plaintiff Exhibit 5). Under the evidence and for the reasons as set forth in the above discussion of Kitty Riley's personal injuries, we are unable to say that the trial court abused its discretion in awarding $4,500.00 to Samuel Riley for his personal injuries.
3. Mr. Riley's special damages.
The trial judge awarded $2,814.50 special damages to Mr. Riley for expenses caused or to be caused the marital community because of the tortfeasor's negligent act.
Before proceeding to a discussion of the special damages awarded Mr. Riley, it is of moment to review the surrounding circumstances of the instant case.
Mr. & Mrs. Riley are residents of Los Angeles, California and at the time of this accident were visiting Mrs. Riley's family and were accompanied by their three minor children on this vacation trip. This accident happened on the day before they were planning to return to Los Angeles. The accident happened on a Saturday and Mr. *244 Riley was due to report back to work in Los Angeles on the following Tuesday morning. This accident occurred on January 6, 1968, and instead of the plaintiffs being able to return home as scheduled for January 9th, they did not return home until February 1, 1968. The automobile was left in New Orleans to be repaired and it was not ready until March 18, 1968. Because of the additional expenses incurred as a result of the accident, including living and medical expenses, plaintiffs were forced to return home by train and to leave their children here in New Orleans because they were not economically able to provide for the children's transportation. Their train fares back home were borrowed from one of Mrs. Riley's employers. Additionally, Mrs. Riley testified that the children had to remain in New Orleans because she was not able to personally care for the children after this accident because of her injuries and upset condition. So as not to cause the children to miss school, they were entered into a school in New Orleans and allowed to complete the school year here.
Defendants object to several of the items of special damages awarded by the trial judge. The first award objected to is that of medical expenses incurred by Mr. and Mrs. Riley with Southern California Permanente Medical Group in the total amount of $253.50. Defendants contend that the second sentence in the first paragraph contained in "Riley 13"[1] merely indicates that this medical group had the right to bring an action in subrogation but that the Rileys themselves have incurred no obligation. The collateral source rule or doctrine as it relates to insurance is not affected by the fact that the insurer is entitled to be subrogated to the rights of the insured as against the tortfeasor or by the fact that the insurer may recover back from the insured the amount of recovery. It is a collateral contractual arrangement which has no bearing upon the extent of liability of the wrongdoer. Cudd v. Great American Insurance Company, 202 F.Supp. 237 (W.D.La., 1962).
The plaintiffs submit that whether or not a specific award is for this item of medical expense, the Rileys will have to pay this amount to the medical group for the services they were rendered under the policy, as a result of the accident. The document marked for identification as "Riley-13" is merely an authorization furnished by the Rileys to their attorney to withhold for the benefit of Southern California Permanente Medical Group said amounts from any settlement of their claim either by compromise or litigation. It is apparent that the Rileys must pay this amount and if this item of special damages is not awarded, then they will have to pay it out of the general damages they recover. Furthermore, as Mr. Riley testified, he pays a monthly premium for this coverage. It should be noted that, had the Rileys not agreed to such an arrangement the medical services could not have been provided and to deny this item of recovery would permit the defendants to escape from paying for the medical services incurred as a result of their negligence.
The best evidence of the Rileys indebtedness for these amounts are the bills themselves identified as "Riley-10" and "Riley-12" which are statements of charges issued directly to Mr. and Mrs. Riley.
The next item of damages complained of is the automobile rental bill in the amount of $48.64. This is for the use of a car for a one day period while the Rileys were in New Orleans and while their own automobile was undergoing repairs. Certainly, this was a reasonable necessity for people who had their whole vacation *245 ruined and who needed an automobile at their disposal while in the City of New Orleans at a time when had it not been for the accident they would not have had to remain in New Orleans in the first place. Barry v. United States Fidelity & Guaranty Co., 236 So.2d 229 (La.App.3rd Cir. 1970); Drewes v. Miller, 25 So.2d 820 (La.App. Orl.1946).
An additional item of damages complained of is the train fare for Mr. & Mrs. Riley covering a trip they made to New Orleans from California on March 7, 1968, in the amount of $100.32. This trip was made by the Rileys in order to pick up their automobile. Their children were still in New Orleans and that is why Mrs. Riley accompanied her husband on this trip. Plaintiffs submit that the exhibit "Riley-16" indicates that this fare was based on a family plan and although the separate fares are not shown, it must be concluded that there was some saving under this plan. Moreover, Mrs. Riley's reasons for returning to New Orleans were occasioned by the accident and were certainly of necessity.
As the defendants point out, the law is quite clear that the injured party is required to minimize his damages. The doctrine of mitigation of damages imposes on the injured person a duty to exercise reasonable diligence and ordinary care in attempting to minimize his damages after the injury has been inflicted. The care and diligence required of him is the same as that which would be used by a man of ordinary prudence under like circumstances. He need not make extraordinary efforts or do what is unreasonable or impracticable in his efforts to minimize damages, although his efforts must be reasonable and according to the rules of common sense, good faith and fair dealing. LSA-C.C. art. 2323; Unverzagt v. Young Builders, Inc., 252 La. 1091, 215 So.2d 823 (1968). Within this framework, we, as did the trial court, find that the plaintiffs exercised reasonableness in the mitigation of their damages which arose out of the negligent actions of the defendants. Considering the factual events attendant to the instant case, we are unable to say that the trial judge erred in awarding these special damages.
Another item of damages complained of is the award for Mrs. Riley's loss of earnings in the amount of $465.00. Mrs. Riley had been employed as a domestic in Los Angeles. Her suit was brought here in New Orleans. She did not work for a company whose payroll records might have been mailed here, but she did do the next best thing, i. e., to obtain individual letters from her employers giving the dates of work and amounts of earnings lost. Short of bringing these employers to New Orleans to testify, Mrs. Riley has done everything she possibly could do to prove with some certainty her loss of earnings. A similar problem was presented most recently to the Supreme Court of Louisiana in the case of Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151, 155 (1971). In the opinion, Justice Tate stated that:
"a claim for loss of earnings need not be proved with mathematical certainty, but only by such proof as reasonably establishes the claim. This may even consist only of the plaintiff's own reasonable testimony, if accepted as truthful; although of course the better practice is to introduce corroborating testimony."
There the Supreme Court allowed such an award even though no documentary evidence was introduced to substantiate the loss of earnings claimed. In the instant case the trial court accepted the claim for loss of earnings as has been substantially established and we perceive no basis to disagree.
Accordingly, for the reasons assigned, the judgment appealed is affirmed at appellants' costs.
Affirmed.
*246 LEMMON, Judge (dissenting in part).
I infer from the trial judge's reasons for judgment and from the majority opinion of this court that a large portion of the award of $6,000.00 to Kitty Riley was based on her claim of continuing nervousness and emotional instability. Since this claim is entirely unsupported by medical evidence, I consider the total award excessive and an abuse of discretion.
On January 19, 1968, less than two weeks after the accident, the treating physician reported his physical examination as completely negative. This was his fourth and last examination of the patient.
One week later Mrs. Riley complained to Dr. Richard Levy, a neurosurgeon, of intermittent headaches and occasional dizziness, as well as pain in the right side of the neck and right shoulder. He diagnosed a mild concussion, from which the headaches and dizziness might keep up for several weeks up to two or three months after the accident.
Mrs. Riley's last medical consultation (with any doctor whose testimony was offered) was two weeks later. Dr. Fuchs, a neurosurgeon in California, diagnosed a suspicion of concussion, based on her complaints of occasional headaches. He characterized the injury as relatively minor. Although Mrs. Riley complained that she suffered severely from nervousness, Dr. Fuchs did not feel that a course of treatment for emotional instability was called for.
Mrs. Riley returned to her regular work schedule in less than three months, after having worked several days during the period of disability. She admitted that her symptoms persisted for only about three or four months following the accident, but she contended that she was still suffering from extreme nervousness at the time of trial and was then taking medication under the care of a physician for this nervous condition.
When the testimony was completed, the case was held open for the taking of medical depositions in California. Yet the doctor then treating Mrs. Riley for nervousness was not produced, nor was his bill or a bill for medicine prescribed by him claimed as items of special damages.[1]
Viewing the medical evidence in the light most favorable to Mrs. Riley and giving her own testimony a great deal of weight, I conclude that the only injuries proved were possible mild concussion and contusions of the neck and thigh, which substantially cleared in four months. Without any proof of a continued nervous condition caused by the accident, I consider the sum of $3,000.00 as the upper limit of any award which could reasonably be made for general damages by the trial judge. I further consider an award which exceeds this upper limit by 100% to be an abuse of discretion.
NOTES
[1] "* * * I understand that medical and hospital services required as a result of acts or omissions of a third party are not included as a benefit under the Kaiser Foundation Health Plan contract, and if such services are provided, the member is required to pay the prevailing charges for such services. The obligation to make such payment is limited to the recovery made by the member from the said third party."
[1] Her total medical expenses were approximately $100.00.