280 So.2d 243 (1973)
Ernest A. PHILLIPS, Jr.
v.
Gregory E. URSIN et al.
No. 5394.
Court of Appeal of Louisiana, Fourth Circuit.
May 15, 1973.
Rehearing Denied July 3, 1973.
*244 Windhorst, Heisler, DeLaup & Wysocki, Robert A. Collins, New Orleans, for plaintiff-appellant.
Montgomery, Barnett, Brown & Read Wood Brown, III, New Orleans, for defendants-appellees.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, R. Henry Sarpy, Jr., New Orleans, for third-party plaintiff and appellees.
Before STOULIG, SCHOTT and BAILES, JJ.
SCHOTT, Judge.
Plaintiff appeals from a dismissal of his action for damages against multiple defendants, Jack C. Appell, Commercial Union *245 Insurance Company, Lloyd R. Tate, Sr., Lloyd R. Tate, Jr. and Phoenix of Hartford Insurance Company. Phoenix has answered the appeal, and has taken a protective appeal from the dismissal of its third-party demand against Appell, Commercial, Tate, Jr. and Ursin.
This action arose out of an automobile accident which occurred at 8:00 PM on May 8, 1968, while plaintiff was a guest passenger in a Pontiac LeMans GTO, operated by Stanley Paysse, and insured for public liability by Phoenix. Just prior to the accident a Thunderbird automobile owned by Appell, driven by Ursin, and insured for public liability by Commercial, had stalled in the right lane of traffic at a point just beyond the Gretna bound exit of the tunnel. Paysse had been approaching the exit of the tunnel from the right lane of traffic while Tate, Jr. was driving his father's white Pontiac in the left-hand lane. Behind the stalled Thunderbird was a Rambler automobile. After passing Tate, Paysse started into the left lane, intending to pass the Rambler, when the Rambler then changed from the right to the left lane. Paysse applied his brakes and his automobile skidded on a 45 angle into the left wall of the tunnel, following which his car was struck from the rear by the Tate Pontiac. Before Paysse collided with the tunnel his automobile first collided with either the Thunderbird or the Rambler or both, but the trial judge found that there was never any contact between Paysse's car and the Rambler. After these happenings the Rambler proceeded on so that the identity of its driver was never known. Plaintiff's suit against Phoenix is based upon the negligence of its insured, Paysse, or in the alternative the negligence of the driver of the Rambler and/or Tate under the uninsured motorist provisions of the policy of Phoenix. Plaintiff's suit against Ursin and his insurer, Commercial, is based upon the theory that Ursin violated statutes which prescribe duties for the driver of a disabled motor vehicle.
The trial judge in written reasons for judgment found that there was no actionable negligence on the part of Tate, Paysse or Ursin, that the proximate cause of the accident was the negligence of the unidentified driver of the Rambler, but that since there was no physical contact established between the Paysse GTO and the Rambler, hit and run coverage under the uninsured motorist provisions of the Phoenix policy was not applicable to the injuries sustained by plaintiff as a result of that unidentified motorist's negligence. Consequently, plaintiff finds himself in the unhappy position of having been a passenger in an automobile involved in a four-car collision with ample insurance coverage on his host driver and yet unable to recover damages for his injuries from anyone. His argument that the trial judge erred in his determination that the unidentified driver of the Rambler was alone responsible for the accident now leads us to an individual consideration with respect to the conduct of each of the drivers involved.
STANLEY PAYSSE, plaintiff's host.
The trial judge was so impressed with the demeanor of this witness during his testimony that he included in his reasons for judgment the observation that where his testimony was in conflict with any other witness he would accept the testimony of Paysse. He found that the only two possible charges of negligence against Paysse were his cutting in front of the Tate Pontiac while switching lanes and speeding. As to the former charge, he found that this was not a proximate cause of the accident because had it not been for the Rambler pulling in front of Paysse he would have passed the stalled Thunderbird successfully and Tate would not have struck him from the rear. As to speed, the trial judge concluded that if he was exceeding the speed limit at all it was by such a small margin that it would not constitute negligence in this case.
*246 In making this determination the trial judge rejected the testimony of the plaintiff to the effect that just prior to changing lanes Paysse was going 80 miles per hour, well in excess of the 45 miles per hour speed limit. The trial judge accepted the testimony of Paysse who testified that he never exceeded 45 miles per hour combined with the testimony of Tate, who estimated Paysse's speed to be 50 to 55 miles per hour at the time he passed the Tate automobile. In discussing Paysse's speed and the possibility that he may have been exceeding the legal limit of 45 miles per hour the trial judge said.
"Even if this be so, the jurisprudence is clear that exceeding the speed limit by a small amount is not negligence per se and is certainly not considered negligence as a proximate cause of the accident by this Court in this case. In addition, the jurisprudence is also clear that speed, of itself, is not a proximate cause of the accident when the speeding vehicle was where it had a right to be. See Emmco v. Durio, 242 So.2d 99 (C.A. 4th Cir., 1971). Paysse testified that he was going approximately 45 mph all throughout the tunnel and that there was no change in speed that he could recall. From all of the above testimony this Court concludes that Paysse was not speeding or, if he was exceeding the speed limit, it was such a small amount that it did not constitute negligence in this case."
Analyzing these and other conclusions of the trial court, we are restrained by cardinal rules to the effect that his findings of fact will not be disturbed in the absence of manifest error and that he was in a better position to assess the credibility of the witnesses who appeared before him than we are upon consideration of a cold record, but we have an advantage in that we can compare minute details of the testimony of all witnesses and scrutinize the uncontradicted physical facts of an accident. This sometimes provides us with a clearer picture of what happened than that which took shape during the heat of the trial. An application of this process to the instant case leads us to conclude that the trial judge erred in his exoneration of Stanley Paysse from negligence as well as in other respects.
Plaintiff testified that only instants elapsed between the time Paysse began to switch lanes after passing the Tate automobile until the time that the accident had occurred. According to plaintiff, at approximately the same time Paysse began to switch lanes the Rambler ahead began to switch; the stalled Thunderbird then came into view; Paysse slammed on his brakes sliding into the embankment on the left; the impact or impacts occurred with the vehicle or vehicles ahead of Paysse; and the Paysse automobile was struck from the rear by Tate; all of these occurring almost instantaneously. Paysse did not gainsay an opinion as to how fast all of these events took place. But Tate's impression was that just after Paysse passed him on his right, and as he was pulling over, another automobile ahead of Paysse backed up and knocked him into the wall to his left, whereupon Paysse's automobile swung back and struck Tate's. Like the plaintiff, he said it all happened suddenly and quickly. It is clear from the testimony and from the trial judge's findings that Paysse was going at slightly over the speed limit so that his passing Tate was attempted under circumstances of high speed and close distances, a maneuver which a reasonably prudent driver would not attempt under the circumstances. If Paysse had simply observed the speed limit he could not have attempted to pass Tate who was traveling at the limit, so that Paysse's violation of the law regarding speed was a legal cause of the accident. In Emmco v. Durio, cited by the trial judge the speed of the plaintiff was not a legal proximate cause.
The trial judge found that the unidentified driver of the Rambler ahead of Paysse was negligent, and we agree with the finding, but the uncontradicted testimony *247 of Gregory Ursin, the driver of the stalled Thunderbird, is to the effect that his vehicle was pulled as far over to the right as possible when he abandoned it, and yet the trial judge found that the right side of Paysse's automobile struck the rear of that Thunderbird during the course of the accident. In order for this to have happened it necessarily follows that the Rambler was tightly sandwiched in between the point where Paysse changed lanes and the Thunderbird was stalled when Paysse began switching lanes and instantaneously skidding into the wall on his left. There is no conflict in the fact that the impact between the Tate and Paysse vehicles followed almost instantaneously, which leads to the conclusion that Tate was also close to Paysse when he changed lanes. All of these factors tend to show that not only was Paysse's excessive speed a proximate cause of the accident, but also his violation of LSA-R.S. 32:79(1) which prohibits changing lanes until the driver first ascertains that such movement can be made with safety. As a result of the negligence of its insured, Phoenix is liable to plaintiff for his injuries.
LLOYD R. TATE, JR.
No manifest error is found in the record concerning the trial judge's determination that this driver did not have an ample opportunity or warning to avoid the accident and was therefore free of negligence.
GREGORY URSIN
Plaintiff and third-party plaintiff, Phoenix, contend that this party's negligence consisted of his violation of that portion of LSA-R.S. 32:141(B) which is italicized in the following:
"The provisions of this Section shall not apply to the driver of any vehicle which is disabled while on the main traveled portion of a highway so that it is impossible to avoid stopping and temporarily leaving the vehicle in that position. However, the driver shall remove the vehicle as soon as possible, and until it is removed it is his responsibility to protect traffic."

There is merit to their contention.
After his automobile stalled, Ursin attempted for a few minutes to flag oncoming traffic from a position he had taken up at the left rear of his automobile, but during that process an automobile almost struck him so that he decided to get out of the tunnel rather than to risk his life. His testimony was to the effect that there was a narrow curbing along the right wall of the tunnel where he could have stood so as to flag traffic and somehow warn it of the presence of his stalled vehicle. Excerpts from his testimony are as follows:
"Q. Now, what about the outside wall of the tunnel. In other words, the wall closest to which your automobile was parked, is there a little curbing or walkway there?
A. Yes, there's a curbing there.
Q. Could you have stood on that curbing; is it wide enough for you to stand on?
A. Correct, yes.
THE COURT:
You are talking about it as you face the outside of the tunnel in the direction you were going on your right?
THE WITNESS:
Correct.
THE COURT:
There's a curbing?
THE WITNESS:
There's a curbing, yes, that I could have stood on, stood on."
This testimony was repeated by Ursin on cross examination by counsel for one of the other parties.
*248 The Judge, in disposing of this position, disclosed that he had conducted a personal inspection of the tunnel and found that the curbing on the right side was only eight inches wide but
"In all fairness to Ursin, even though he apparently conceded in his testimony that he could have stood on this curbing, he admitted he didn't know how wide it was, and there is no conceivable way, in the mind of the court, that Ursin could have safely stood on this eight inch curbing inside the tunnel without great danger to himself from passing automobiles. In fact, the court started to walk down the one foot curbing by the approach to the tunnel and, almost immediately, became so frightened by the speeding traffic that was rushing by a foot or two away, that the court immediately abandoned this experiment and made its other observations from the catwalk which overlooks the lane."
It is apparent from the foregoing that the trial judge's conclusions were largely influenced by an experiment which he conducted outside of the presence of the parties and under circumstances which were not necessarily the same as or even similar to those which existed at the time of the accident in question. In Orgeron v. Muhleisen, 256 So.2d 458 (4th Cir. 1972) this Court considered the propriety of such conduct and said:
"A trial judge may certainly visit an accident scene to accomplish a better understanding of the testimony of the witnesses by viewing the described physical surroundings. This only becomes improper when the judge conducts tests at the scene in order to supply evidence and then bases his conclusions on that evidence. The conclusions of the trial judge must be based on the evidence produced at trial and not on post-trial data that he improperly develops at the accident scene."
There are good reasons for this rule. First, where the trial judge conducts such viewings outside the presence of the parties and their counsel there is no assurance that conditions at the time are the same as or similar to conditions which existed at the time of the accident. The parties have no opportunity to confront the judge or to cross-examine him as to the time, circumstances and conditions of his visit to the scene. Consequently, on appeal, the record contains only that which the judge intends to convey without any opportunity afforded to the parties to take issue with the substance of his findings.
What is especially damaging to the rights of the parties in the instant case is the fact that they are confronted with his mental impressions and conclusion devised subjectively from his view of the scene which now influences him to hold that Ursin violated no duty. The trial judge says he became so frightened while on that curbing that he would not impose that duty on Ursin. But the parties have no opportunity to cross-examine the judge to explore whether his subjective reaction to his experiment was that which a standard reasonably prudent man under the circumstances would experience.
Finally, we have in this case a situation where the trial judge, after the case was tried and beyond the knowledge of the parties and their counsel, conducted an experiment which normally would be conducted by an expert who would be permitted to offer his opinions and conclusions from the facts as he found them subject to cross-examination by the parties. Here, the trial judge's activities were such that he became the expert, conducted an experiment and made determinations which are beyond the pale of cross-examination by anyone.
Returning to the question of whether Ursin violated R.S. 32:141(B), the language of the statute is broad to the effect that it is the responsibility of the driver of the disabled vehicle "to protect traffic." From the evidence contained in the record we are convinced that he had the *249 opportunity to stand behind his disabled vehicle on the curbing and flag oncoming traffic so as to provide it with some protection and yet he took no such action other than for the few minutes in which he did position himself in a highly dangerous place at the left rear of his automobile almost in the middle of the highway. Therefore, he failed in his statutory duty.
Ursin's dereliction is precisely within the purview of the rules set forth in Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298, and Pierre v. Allstate, 257 La. 471, 242 So.2d 821. In the latter decision the Court made the following observation:
"Additionally, while the two decisions (Dixie and Pierre) involved different statutes, in each case the statutory duty was imposed in order to avoid a similar risk, and in each case the particular violation of duty created the same riskthat is, that an inattentive driver might precipitate an accident because a vehicle obstructed the highway."
As in those cases, the failure on the part of Ursin to discharge "his responsibility to protect traffic" as required by the statute was a legal cause of the accident which occurred. Had he gone a short distance to the rear of his disabled automobile and flagged oncoming traffic to warn it of his disabled vehicle the two Pontiacs (Paysse's and Tate's) would not have been in the position where they were moving at relatively high speeds approaching that scene where the disabled vehicle was located, the drivers completely oblivious to the danger ahead of them. It is obvious that had the Thunderbird not been there or had Ursin stationed himself far enough beyond it to warn oncoming traffic the Rambler would not have been just behind it at a stopped or backing position, and Tate and Paysse seeing his flagging would have reduced their speeds so as to permit the maneuver of the Rambler around the disabled Thunderbird of Ursin.
It follows from our imposition of liability on Gregory Ursin that liability is likewise imposed upon Commercial, the insurer of Jack C. Appell, the owner of the automobile being driven or used by Ursin at the time of this collision. While Commercial denies coverage in its pleadings, the policy is in evidence and contains the standard definition of insured so as to include any person having custody of the automobile with the permission of the named insured. Nothing in this record suggests that Ursin would not be included in this definition.
QUANTUM
Plaintiff was admitted to West Jefferson General Hospital just after the accident on May 8, 1968, and on the following morning was first seen by his treating physician, Dr. Russell T. Ribando, a general practitioner. Diagnosis of a cervical sprain, a lumbar sprain, multiple bruises and contusions of the body, sprain of both shoulders, bruises of the chest and nose bleed, was based upon findings of spasm in the cervical area, tenderness in the paraspinous and paravertebral muscles, inability to rotate the head laterally or to flex or hyperextend the head without pain, complaint of pain on attempting mild exercises, tenderness with spasm in the lumbar region, spasm of the right and left shoulder, muscular bruises about the chest and between the ribs and blood clots in the nasal passages.
Treatment consisted of diathermy treatments at the doctor's office at intervals of every three or four days from May 11 until June 21 and at weekly intervals until October 23 when he was discharged with only mild residual tenderness in the cervical spine. A surgical collar was prescribed and worn from May 31 to July 28 and medication consisted of muscle relaxants, tranquilizers for nervousness and analgesics consisting of half grain codeine. No physical therapy was prescribed but the use of a bed board and heating pad was recommended. On January 28 he returned *250 to Dr. Ribando complaining of severe pain in the right side of the neck and right shoulder which medication did not relieve. Examination revealed muscular spasm, tenderness in the right posterior cervical muscles, extending into the right shoulder, limitation of motion in the right shoulder, and inability to rotate his head completely to the left lateral side without pain. Diagnosis was recurrence of cervical sprain on the right side of the neck and right shoulder.
Diathermy treatments were resumed at intervals of four days until his discharge on March 15. At this time the only residual was slight discomfort in the cervical area for which he was advised to take his medication as needed.
On September 13, 1968, plaintiff was examined by Dr. Raeburn C. Llewellyn, a neurosurgeon, who concluded that he had no neurosurgical problem but he did have residuals of injuries to the muscles and ligaments based upon complaints of pain on palpation from the cervical muscles extending into the shoulder.
Plaintiff's testimony that his injuries interfered with his progress as a student at Delgado College was corroborated by a letter to the College from Dr. Ribando dated September 27, 1968, advising that he had advised plaintiff to resign from the school because his symptoms had become more severe necessitating more frequent treatments. Also, the academic records show that in two of his eight courses during the spring, 1968, term, plaintiff received "incomplete" grades and he withdrew from all four of his courses in the fall of 1968. Plaintiff testified that he went back to Dr. Ribando in January, 1969, because he couldn't perform his duties as a draftsman because of pain in the neck and shoulder. He said that he still had occasional headaches and pain in the neck and shoulder and still used a heating pad as of the date of the trial in February, 1971.
For his general damages plaintiff is entitled to an award of $4,000, Cf. Lusk v. Travelers Insurance Co., 250 So.2d 197 (La.App. 1st Cir. 1971), Riley v. Frantz, 253 So.2d 237 (La.App. 4th Cir. 1971), Muhleisen v. Orgeron, 256 So.2d 461 (La. App. 4th Cir. 1972). He is also entitled to his medical expenses totaling $899.23 and consisting of a hospital bill of $255, doctors' bills of $629 and a $15.23 bill for the surgical collar.
DECREE
Accordingly, the judgment of the trial court is reversed, and
It is ordered, adjudged and decreed that there be judgment in favor of plaintiff, Ernest A. Phillips, Jr. and against defendants Commercial Union Insurance Company and Phoenix of Hartford Insurance Company jointly and in solido in the full and true sum of $4,899.23 with legal interest from date of judicial demand until paid and all costs; and
It is further ordered, adjudged and decreed that there be judgment in favor of Jack C. Appell, Lloyd R. Tate, Sr. and Lloyd R. Tate, Jr. dismissing the main demand of the plaintiff and the third-party demand of Phoenix of Hartford Insurance Company against them; and
It is further ordered, adjudged and decreed that there be judgment in favor of Phoenix of Hartford Insurance Company on its third-party demand against Gregory E. Ursin and against Commercial Union Insurance Company jointly and in solido for one-half of its liability to plaintiff on the main demand.
All costs of this Court are to be borne equally by Phoenix of Hartford Insurance Company and Commercial Union Insurance Company.
Reversed.

ON APPLICATION FOR REHEARING
PER CURIAM.
In their application for rehearing Commercial Union Insurance Company and *251 Gregory Ursin complain that the original decree should be modified to strike that portion which awards a judgment to Phoenix of Hartford Insurance Company on its third-party demand against the applicants. They correctly point out that the third-party demand of Phoenix sought recovery only in the event that it was cast in judgment to plaintiff under the uninsured motorist provisions of its policy. Since plaintiff made no recovery under the uninsured motorist provisions, the third-party demand of Phoenix against Gregory E. Ursin and Commercial Union Insurance Company should be and is hereby dismissed.