712 So.2d 885 (1997)
Richard CONSTANS, et al.
v.
CHOCTAW TRANSPORT, INC., et al.
James PEAR
v.
CHOCTAW TRANSPORT, INC., et al.
Nos. 97-CA-0863, 97-CA-0864.
Court of Appeal of Louisiana, Fourth Circuit.
December 23, 1997.
Writ Denied March 27, 1998.
Order Amending Decree on Grant of Rehearing January 15, 1998.
*887 Kathleen E. Simon, Simon and Rees, Covington, for Appellant.
Charles A. Boggs, Edward A. Rodrigue, Jr., Boggs, Loehn & Rodrigue, New Orleans, for Appellants.
James R.E. Lamz, Deanna J. Hamilton, Lamz & Associates, Slidell, for Appellant.
Before BYRNES, LOBRANO and JONES, JJ.
BYRNES, Judge.
On August 31, 1993 an 18-wheeler tractor trailer operated by Roosevelt Samuels was involved in a collision with a Mazda 626 passenger vehicle driven by the plaintiff, James Pear. Pear had three guest passengers: Patrick Neale, Richard Constans and Stephen Thompson. Pear and his passengers were injured. The guest passengers and their spouses (hereinafter referred to simply as "the guest passengers") sued[1] Choctaw Transport, Inc., Debose Trucking Company, Inc., Roosevelt C. Samuels and the Northern Assurance Company of America.[2] It was stipulated in the course of the trial that: "Roosevelt Samuels was driving the tractor in the course of his employment with Debose and in the course of Choctaw's business with Debose pursuant to the lease agreement."[3]
Also named and served as a defendant in the suit brought by the guest passengers was Allstate Insurance Company as the liability insurer of James Pear.[4] No allegations of *888 negligence or fault were made by the guest passengers against James Pear, individually, who was neither named in nor served with the original petition filed by the guest passengers. The trucking company interests filed an answer to the guest passengers in the Constans case and asserted an Alternative Cross-Claim naming as defendants James Pear and Allstate Insurance Company.
James Pear filed a claim against the trucking company interests. Pear's case was consolidated with the earlier filed Constans case. Shortly before the May 20, 1996 trial date the trucking company interests agreed to settle with the guest passengers. Consequently, the commencement of the trial was then postponed. The trucking company interests agreed to the following settlement:

Richard and Deborah Constans $ 45,000.00
Stephen and Margaret Thompson $210,000.00
Patrick and Dale Neale $340,000.00

Copies of the "Receipt, Release, Hold Harmless, Subrogation and Assignment" were placed in evidence by the trucking interests and the guest passengers dismissed their claims against Roosevelt C. Samuels, Debose Trucking Company, Inc. Choctaw Transport, Inc., the Northern Assurance Company of America, International Insurance Company and Westchester Fire Insurance Company. The "Motion and Order of Dismissal" reserved the rights of the guest passengers "and their assignees and/or subrogors, to pursue their cause of action against James Pear, Allstate Insurance Company, or any other responsible party." While the motion to dismiss the Neale claims was filed, the record does not include any motion to dismiss the claims of the Constans or the Thompsons.
On August 22, 1996, less than 60 days prior to the rescheduled trial date of October 14, 1996 the trucking company interests filed a "Supplemental and Amending Petition for Damages" asserting that they had been substituted as party plaintiffs to the rights of the guest passengers and were the legal successors in interest of the guest passengers. This supplemental and amended petition was presented to and the order permitting it to be filed was signed not by Judge Sholes, to whom this matter was allotted and by whom it had been set for trial, but was instead presented to and ordered filed by Yada Magee, judge of another division. In this supplemental and amended petition the trucking interests sought "judgment over for full indemnity, including interests and costs, from the date of payment, and in the further alternative, contribution from defendants, James Pear and Allstate insurance Company, for principal, interest and costs associated with the underlying claim."
James Pear and Allstate Insurance Company filed multiple motions and exceptions to the supplemental petition, including: Peremptory Exception of Prescription, Declinatory Exception of Insufficiency of Citation and Service of Process and Motion to Vacate the Order signed by Judge Magee allowing the filing of the supplemental petition by the trucking interests. On the morning of the trial the trial court ruled that the supplemental petition had not been filed in accordance with the applicable Rules of Court and ordered it stricken. The trial court also ruled that the striking of the supplemental petition had rendered moot the other motions and exceptions, including the exceptions of James Pear. However, the trial court allowed the trucking interests to proceed on the basis of their Alternative Cross-Claim.
At the trial the jury found the plaintiff, James Pear, had suffered $97,500.00[5] of damages, but that he alone was at fault and that his negligence was the legal cause of the accident. The jury also found that the three guest passengers had suffered $594,000.00 in damages, in addition to which the trial court *889 awarded certain stipulated special damages in its first judgment rendered on November 18, 1996. In that judgment the trial court condemned James Pear and Allstate to pay the trucking company interests $744,860.37 plus all costs and certain expert witness fees. Allstate and James Pear filed a "Motion To Vacate Judgment, Motion For New Trial And/Or Alternatively Judgment Not Withstanding The Verdict" which was fixed for hearing on December 13, 1996.
Pursuant to that hearing, an amended judgment was rendered on December 17, 1996 dismissing all claims against James Pear and reducing the judgment against Allstate to $100,000.00, plus interest, all costs, and certain expert's fees. Without another hearing being held, the trial court rendered another amended judgment on December 23, 1996. The only change made by this second amended judgment appears to be in the last line of the fourth full paragraph on the second page where the word "his" is found in the first amended judgment and the word "their" is found in the second amended judgment. The effect of this change would be to shift some costs ("his cost") from James Pear to the trucking company interests ("their costs"). Other than this minor change the second amended judgment is identical to the first amended judgment. Allstate and James Pear appealed. The trucking company interests filed an answer to the appeals.

I. THE ALTERNATIVE CROSS-CLAIM OF THE TRUCKING COMPANY INTERESTS
The alternative cross-claim of the trucking company interests denies all liability and states that the cross-claim is to apply "only in the event that any liability is found on their part." Allstate contends that:
Since the settlements with the Guest Passenger Plaintiffs extinguished all liability of the Trucking Company Interests to the Guest Passenger Plaintiffs, there can be no liability of the Trucking Company Interests to the Guest Passenger Plaintiffs and the Alternative Cross-Claim is therefore moot.
Pear and Allstate advance Phillips v. Ursin, 280 So.2d 243 (La.App. 4 Cir.1973), as authority for the proposition that where a third party demand seeks recovery only in the event that the third party plaintiff (in this case the trucking company interests) is cast in judgment to the original plaintiffs (in this case the guest passengers), the third party demand must be dismissed when the claim against the third party plaintiff is dismissed. Because Pear was found to be 100% at fault, no liability was found on the part of the trucking company interests. Pear and Allstate contend that the trucking company interests cross-claim is limited by its own language to situations in which the trucking company interests were found to be liable. Therefore, Pear and Allstate conclude that the language of the cross-claim asking for recovery "only in the event that any liability is found" on the part of the trucking company interests precludes recovery by the trucking company interests under the cross-claim. However, on this issue the exact language of this Court in Phillips is important:
Since plaintiff made no recovery under the uninsured motorist provisions, the third-party demand of Phoenix against Gregory E. Ursin and Commercial Union Insurance Company should be and is hereby dismissed. [Emphasis added.]
In the instant case, "recovery" was made against the trucking company interests in the form of the settlement. There was no settlement made by the third party plaintiff and his insured in Phillips. Therefore, there was no attempt by the third party plaintiff uninsured motorist insurance company and its insured in Phillips to recover funds paid in settlement under the uninsured motorist provision of the third party plaintiff's insurance policy. There is nothing in Phillips that would prevent this Court from treating the settlement payments made by the trucking company interests in the instant case as the "recovery" referred to in Phillips. Following this line of reasoning, Phillips would permit just the kind of third party claim now being asserted by the trucking company interests. Phillips does not say that the only recovery that may be taken into account is recovery obtained by court decree in the course of litigation. In fact, as will be discussed *890 hereafter in greater detail, this Court has held in an opinion that was affirmed and adopted by the Supreme Court that the right of contribution is substantive and arises out of the payment of the obligation of a solidary co-debtor without the necessity of first reducing that obligation to judgment. Morris v. Kospelich, 206 So.2d 155 (La.App. 4 Cir. 1968), affirmed, 253 La. 413, 218 So.2d 316 (1969).
Allstate argues that the trucking company interests were not solidarily liable with James Pear because he was found to be 100% at fault and the right of contribution only arises among joint tortfeasors. Morris v. Kospelich, 206 So.2d 155 (La.App. 4 Cir. 1968), affirmed, 253 La. 413, 218 So.2d 316 (1969). Because the trucking company interests were found to be free from fault they are not joint tortfeasors.
We agree that the finding after a trial on the merits that James Pear was 100% at fault means that the trucking company interests were ultimately determined not to be solidary obligors with Pear to the guest passengers. However, under the facts of this case it is sufficient that at the time of the settlement that the trucking company interests were named defendants for the obligation for which Pear was ultimately found to be 100% liable, and, therefore, potentially solidarily liable for that obligation. We find that LSA-C.C. art. 1805 contemplates not only actual solidary liability, but such potential liability as existed in the instant case prior to judgment:
A party sued on an obligation that would be solidary if it exists may seek to enforce contribution against any solidary co-obligor by making him a third party defendant according to the rules of procedure, whether or not that third party has been initially sued, and whether the party seeking to enforce contribution admits or denies liability on the obligation alleged by plaintiff. [Emphasis added.]
The words emphasized in LSA-C.C. art. 1805 recognize that contribution may proceed from the concept which we shall designate as "potential solidary liability," i.e., where a party pays in settlement a claim based on an allegation of fault, that party may seek contribution from others found to be at fault, even in those cases where it is ultimately determined that the party paying the settlement was free from fault. We reach this conclusion for three general reasons:
(1) The contingent nature of the language emphasized above in LSA-C.C. art. 1805.
(2) Under Allstate's theory of contribution arising out of solidarity, a joint tortfeasor found to be 99% at fault could seek contribution from the party responsible for only 1% of the fault, but contribution would be denied to a party free from fault who settles a claim in good faith when another party is later determined to be 100% at fault. Under Allstate's theory the party who is 100% at fault is better off than the party who is only 1% at fault. In other words, Allstate asks this Court to reward James Pear (and his insurer, Allstate) for being 100% at fault. Allstate's theory would, therefore, provide a perverse incentive for any tortfeasor(s) remaining after a settlement with innocent victims to avoid contribution by simply "confessing" to total responsibility for the accident, e.g., "I hate to admit it but I dozed off," or "In good conscience I have to confess that I was trying to dial my car phone," or "I just had to get it off my chestI was distracted trying to change tapes in my tape player,"or any number of other easily made but hard to disprove insincere confessions.[6]
Similarly Allstate's argument would mean that the trucking company interests would be forced to attempt to convince the jury that they were to some extent at fault, instead of presenting an all-out defense, which is, of course, ridiculous because it would be impossible for them to control the jury's broad discretion in fixing faultall of which shows that the approach urged by Allstate would only work if the parties had a crystal ball and *891 the jury had no discretion. We do not believe that such an irrational result was contemplated by LSA-C.C. art. 1805.
(3) In interpreting LSA-C.C. art. 1805 it should be read through the lens of the strong policy favoring settlements and compromises. Allstate's theory of contribution based on solidary liability would play havoc with settlement efforts. Allstate's theory demands that parties have a crystal ball that would predict with precision the outcome of the fact-finder's determinations on questions of fault and its allocation. As the Supreme Court has indicated explicitly that it holds the fact-finder to no such precise standards Clement v. Frey, 95-1163 p. 7-8 (La.1/16/96), 666 So.2d 607, 610-611), it is unreasonable to expect parties in the course of settlement negotiations to anticipate the fact-finder's conclusions on allocation of fault with any certainty or precision. In fact, it is this very unpredictability that underlies and drives the settlement process. As this Court stated recently in Riley v. Reliance Insurance Company and Lake Terrace Center, Inc., 97-0445 p. 6-7 (La.App. 4 Cir. 11/19/97), 703 So.2d 158:
Thus, Clement tells us that the allocation of fault is not an exact science, or the search for one precise ration. Rather, it is an acceptable range and any allocation by the jury within that range cannot be "clearly wrong." In Clement the Supreme Court held that any allocation of fault falling between a ratio of 50/50 and 75/25 would be reasonable. This very broad range is illustrative of the analogy referred to in ... Clement, comparing fault and quantum determinations. Mindful that in quantum determinations, Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), affords the factfinder "great, even vast" discretion, the Clement analogy mandates this Court to afford considerable latitude to the trial court in matters of fault allocation.
The allocation of fault in Clement was found to be acceptable anywhere from an equal allocation (50/50) all the way to an allocation with a fifty percentage point spread (75/25). Although we do not take the position that every fact situation would call for a like range (the discretionary range may be more or less depending on the facts), Clement does indicate in the clearest manner possible that when it comes to the allocation of fault, the discretion of the fact finder is considerable.
Added to these three general reasons are additional factors specific to this case. For example, there are no practical notice problems or prejudice in this case because both Allstate and James Pear were already parties to this litigation prior to the expiration of the prescriptive period. James Pear and Allstate would have made the same denials of fault based on the same evidence even had there been no settlement.
We specifically limit this concept of "potential solidary liability" to contribution situations similar to the instant case. Nothing in this opinion is intended to suggest that the concept be extended to apply to such issues as the interruption of prescription based on solidary liability as to a joint tort feasor or "potential" joint tort feasor never made a party to the litigation, because the three considerations listed above would not apply.
The right acquired by a subrogee and/or assignee can be no more (and no less) than the right of the original parties. Illinois Central Gulf Railroad v. Deaton, Inc., 581 So.2d 714, 716 (La.App. 4 Cir.1991). Because the guest passengers filed no claim against James Pear, James Pear argues that the guest passengers had no rights against him that they could transfer to the trucking interests by way of subrogation. This is not the case. The guest passengers had rights against Pear. The fact that they had not yet filed suit at the time of the settlement to assert those rights, does not mean that the rights did not exist. In Illinois Central the settling party seeking contribution was denied that right because the settlement agreement was found to have effectively completely released all parties without limitation or qualification,[7] including the party against *892 whom subrogation was sought. In Illinois Central no rights were reserved in the settlement against the party from whom contribution was subsequently sought:[8]
When a party has released a party, that party is no longer an obligor to the plaintiff. Thus neither the plaintiff nor anyone seeking to stand in the shoes of the plaintiff through subrogation can have a cause of action against the released party.

Illinois Central, 581 So.2d at 716.
Citing Morris v. Kospelich, 253 La. 413, 218 So.2d 316, 317 (1969), Allstate contends that a separate suit is the only procedural vehicle whereby the trucking company interests could properly seek contribution for the settlement with the guest passengers. Therefore, Allstate contends that it was error for the trial court to award contribution to the trucking company interests pursuant to the Alternative Cross-Claim as it was not a separate suit.
It is true that in Morris v. Kospelich, the Supreme Court stated at 218 So.2d at 317:
We have reached the inevitable conclusion that if a joint tortfeasor discharges the debt through the medium of a compromise, he may request contribution from his fellow joint tortfeasor by an independent plenary action. [Emphasis added.]
In effect, Allstate would have this Court read the permissive "may" highlighted in the quote from Morris as mandatory. In other words, Allstate contends that because the Supreme Court in Morris authorized the recovery of settlement payments via a separate suit for contribution, that the Supreme Court intended thereby to prohibit such a recovery via a cross-claim or third party demand. Allstate reads too much into the word "may." There was no attempt in Morris to recover contribution from a joint tortfeasor via a third party demand or a cross-claim. The Supreme Court opinion in Morris was very brief. For a fuller explanation the Supreme Court not only affirmed the Fourth Circuit appellate decision in that matter, but expressly declared that:
We adopt the opinion of the Court of Appeal, Fourth Circuit, reported at 206 So.2d 155, as the opinion of this Court.
Id.
Reference to the appellate opinion rendered by this Court in Morris, which as just noted was adopted as the opinion of the Supreme Court, expressly recognizes the use of third party procedure as a proper vehicle for the recovery of contribution from a joint tortfeasor:
To reiterate, the phraseology of [former LSA-C.C. art. 2104, now LSA-C.C. art. 1804] merely consists of an explicit grant of the option to use third party procedure in order to be certain that the courts would not misinterpret it and thereby deny this form of action to a joint tortfeasor. We hasten to point out that the language of Article 2103 is permissive in that it provides that a defendant who is sued on an obligation solidary in may seek to enforce contribution by third party practice.
Morris, 206 So.2d 155, 159 (La.App. 4 Cir. 1968).
Thus in Morris this Court noted that the expected means for a joint tortfeasor to recover a claim for contribution is through a third party claim. The significance of Morris is that it refused to limit such claims to third party practice, choosing instead to broaden the acceptable means of recovery to include separate suits. There is no merit in Allstate's contention that the only proper vehicle whereby the trucking company interests seek contribution is via a separate suit.
Allstate also cites Morris for the proposition that the assignment of rights that the trucking company received from the guest passengers bars them from seeking contribution, contending that contribution is due only when there has been a complete and unconditional release in the settlement of the joint tortfeasors from whom contribution is sought. Morris does not say anything like *893 that. Morris is silent regarding the language of the settlement which formed the basis of the claim for contribution in that case. Nor is there any dicta in Morris suggesting how settlement document language should be treated generally. We can only assume that Allstate must be referring to this Court's quotation at 206 So.2d at 158 from former LSA-C.C. art. 2104:[9]
If one of the codebtors in solido pays the whole debt[10], he can claim from the others no more than the part and portion of each. [Emphasis added.]
The trucking company interests paid the whole debt. Current LSA-C.C. art. 1804 uses the phrase, "rendered the whole performance", but the meaning is the same as "pays the whole debt", as regards the instant litigation. Nothing in either of these articles requires the settlement of the trucking company interests to contain "a release for James Pear and/or Allstate Insurance Company" as Allstate argues in its brief. Morris does not say that a settlement which contains an assignment of rights language causes a forfeiture of the right to contribution. Such language does not prejudice Allstate and Pear, and in view of this Court's language in Illinois Central, supra, would probably have been included by any prudent attorney. Where the guest passengers accept the settlement in full satisfaction of their claims, there is no necessity that the settlement contain any special language releasing Pear and Allstate. Such release occurs by operation of law. It is the payment of the debt that gives rise to this release and the right of contribution, not some magical language in the settlement document. As this Court noted in Morris, 206 So.2d at 158, the right to contribution is a substantive right that arises by operation of law. And Morris stands for the proposition that courts should not be unduly technical in placing procedural obstacles in the path of joint tortfeasors seeking contribution. We may safely assume that the public policy favoring the expeditious recovery of injured parties is a major factor favoring procedures that would encourage such recovery by aiding in the enforcement of the right of contribution. To hedge the right of contribution about with highly technical matters of form over substance would act as a powerful disincentive for any tortfeasor or joint tortfeasor to make any payment in the absence of a full adjudication of the rights of all parties. This Court's decision in Morris points out that the legislature created the substantive right of contribution in order to nullify the requirement that contribution between joint tortfeasors be limited to those matters, including the question of solidarity itself, already reduced to judgment and thereby facilitate the voluntary payment of claims.
Moreover, Allstate's contention that the assignment and reservation of rights found in the settlement impairs the trucking company interests' right to contribution is contradicted by this Court's decision in Illinois Central Gulf Railroad v. Deaton, Inc., 581 So.2d 714, 716 (La.App. 4 Cir.1991). As explained earlier in this opinion, this Court held that the settling party seeking contribution was denied that right because the settlement agreement contained no reservation of rights against the party against whom the right of contribution was subsequently sought to be enforced, and all parties were found to have been effectively released without restriction or qualification.
Illinois Central, cited many times by Allstate and James Pear, contradicts their argument that the settlement must provide them *894 with a full release before the trucking company interests can claim a right of contribution. This court in Illinois Central held that it was just such a full release in that case that resulted in the loss of the right of contribution.[11] Thus, while James Pear and Allstate argue that the failure of the settlement agreement to provide them with a complete release results in the forfeiture by the trucking company interests of their right of contribution against them, Illinois Central, which is one of the principle authorities upon which they rely indicates the oppositethat the failure to reserve rights results in the loss of contribution. We feel that Illinois Central has contributed to this confusion. In Ducote v. Commercial Union Ins. Co., 616 So.2d 1366, 1370 (La.App. 3 Cir.), writ den. 620 So.2d 877 (La.1993), unlike in Illinois Central, the release in the settlement agreement was found not to have caused a forfeiture of the right of contribution.[12]
In Illinois Central this Court adopted a theory of unjust enrichment[13] as *895 necessary to prevent an inequitable result and afford recovery to the party who had paid in settlement what later was determined to be an obligation attributable 100% to the fault of another. Such an approach is not necessary in the instant case because the settlement between the trucking interests and the guest passengers did not contain a blanket release of all parties including James Pear and his insurer. For this reason Illinois Central is distinguishable from the instant case. However, it is significant that even where this Court felt that the right to contribution had been lost in Illinois Central, this Court went to great lengths to enable the settling joint tortfeasor to recover what would have been recoverable under the right of contribution. This is another emphatic indication that the policy of encouraging joint tortfeasors and potential joint tortfeasors to settle by providing them with contribution or its equivalent from their co-obligors or potential co-obligors is strongly favored.
For the trucking interests to be entitled to the benefits of subrogation they must first show that they satisfied the entire obligation owed to the guest passengers, not just the portion potentially owed by them. Ducote v. Commercial Union Ins. Co., 616 So.2d 1366, 1370 (La.App. 3 Cir.1993).
In Ducote, 616 So.2d at 1370, the court noted that:
The intent of the parties to the agreement is to settle the entire obligation and have appellees seek contribution from appellants. Their intentions were muddled by the overcautious phrasing of the drafters, but implicit in the agreement is the plaintiff's desire to be free of any further participation in the suit. [Emphasis added.]
In the instant case the intention of the guest passenger plaintiffs to be free of further involvement in this litigation was manifested by the fact that they received the settlement payments as full satisfaction of all of their claims arising out of the accident; by the fact that the guest passengers assigned and subrogated all of their rights against James Pear and Allstate to the trucking company interests as part of the settlement; and by the fact that after the settlement whatever rights they may have had were pursued by the trucking company interests and their attorneys. The attorney for the guest passengers dropped out of the case. Subsequent to the settlement the guest passengers made no effort on their own to collect from either Allstate or James Pear, or to pursue their claims in any other manner. Their actions demonstrated that they considered their claims to have been fully satisfied by the settlement with the trucking company interests.
Conventional subrogation of personal injury claims is not permitted, and contribution may not be sought by that means. Ducote, 616 So.2d at 1369. As any subrogation recovery by the trucking company interests can only be by way of legal subrogation, such recovery is limited to the virile portion of what is determined actually to be owed. To the extent that the trucking company interests may have paid more than that in settlement, legal subrogation affords them no reimbursement. Therefore, the contribution-subrogation claim of the trucking interests is limited to the lesser of the amount that they paid in settlement or the virile portion of what is determined actually to be owed.
The trucking company interests paid $45,000.00 to Constans in settlement, but the actual damages were determined to be only $16,327.42. Therefore, contribution-subrogation claim of the trucking company interests is limited to $16,327.42 in connection with the Constans claim. The trucking company interests paid $210,000.00 to Thompson, but the actual damages were determined to be only $184,674.12. Therefore, the contribution-subrogation claim of the trucking company interests is limited to $184,674.12 in connection with the Thompson claim. The trucking company interests paid $340,000.00 to Neale in settlement, but the actual damages were determined to be $543,858.03. Therefore, the contribution-subrogation claim of the trucking interests is limited to $340,000.00 *896 in connection with the Thompson claim. In the aggregate, the contribution-subrogation claim of the trucking company interests is limited to a total of $541,001.54.
Because of the necessity of determining the virile share of each of the guest passengers, it was not error for the trial court to include the names of the guest passengers on the jury verdict form.
We find no merit in the following Allstate argument:
The Alternative Cross Claim states that the Trucking Company Interests deny all liability and that the cross-claim is to apply "only in the event that any liability is found on their part...." Since the settlements with the Guest Passenger Plaintiffs extinguished all liability of the Trucking Company Interests to the Guest Passenger Plaintiffs, there can be no liability of the Trucking Company Interests to the Guest Passenger Plaintiffs and the Alternative Cross-Claim therefore is moot.
"Liability" as used by the trucking company interests in the Alternative-Cross Claim is broad enough to include the settlement payments made by the trucking company interests to the guest passengers. Although a very narrow, ultra technical, literal reading of the Alternative Cross-Claim could construe the quoted language as a plea for recovery only in the event judgment is rendered finding fault with the trucking company interests, it is obvious that what the trucking company interests were asking for was recovery for anything they paid to the guest passengers for which Pear and Allstate were ultimately found to be responsible. There is no doubt that Pear and Allstate were neither deceived nor prejudiced by this more reasonable reading of the Alternative-Cross Claim language which was obviously just boiler-plate. Remember, the same paragraph in the Alternative Cross-Claim also contains a simultaneous denial of all liability by the trucking company interests, which is specifically permitted by LSA-C.C. art. 1805. The very literal reading of the Cross-Claim suggested by Allstate is impossible to reconcile with the language of the pleading and LSA-C.C. art. 1805, because it would be literally impossible to be entitled to recover sums for which you are held liable while simultaneously being free from all liability. But that is precisely what LSA-C.C. art. 1805 permits you to do. And it is precisely because of this paradoxical nature of LSA-C.C. art. 1805 that we feel that the legislature intended that the right of contribution extend to situations in which the party seeking contribution has made payment in contemplation of potential liability from which that party was ultimately completely absolved as were the trucking company interests in this case.
The first time that James Pear was named as a party in any capacity in the instant case was in the cross-claim filed by the trucking company interests which was not filed until after the one-year prescriptive period for the guest passenger claims would have prescribed unless interrupted by some other means. But Allstate is solidarily liable with its insured, James Pear, and the timely filing of the suit against Allstate by the guest passengers interrupts prescription as to Allstate. Anderson v. Sciambra, 310 So.2d 128, 131 (La.App. 4 Cir.1975) is cited by James Pear in support of the proposition that his solidary liability, if any, is limited to Allstate's $100,000.00 policy limits. Anderson does support Pear's contention, but it is an old case that fails to provide a rationale for reaching such a result, and, more significantly, it has been implicitly overruled by the Supreme Court in Hoefly v. Government Employees Insurance Co., 418 So.2d 575 (La.1982), and Williams v. Sewerage and Water Board, 611 So.2d 1383 (La. 1993.) In Williams the Supreme Court held that suit filed against the employer for worker's compensation would interrupt prescription against the tort feasor, reversing this Court opinion's that the claim for compensation was not solidary with the deceased worker's third party tort claim. The Williams court noted that "some elements of compensation damages are the same as tort damages ..." Williams, 611 So.2d at 1387. Of crucial importance to the instant case, Williams went on to state that:
The court of appeal's error was its focus that solidary obligors must be liable for *897 the same performance based on the same cause of action.
* * * * * *
The Hoefly court showed that the sources of the obligors' debts are irrelevant so long as they are both obligated to the same thing, that is, to repair the same damage.
* * * * * *
In Hoefly, the uninsured motorist carrier was liable only to the extent of its policy limits and only under the conditions and terms of the policy. Nonetheless, the court held that the obligations between the uninsured motorist carrier and the tort-feasor were solidary to the extent that each was liable for the same damage. [Emphasis added.]

Williams, 611 So.2d at 1388.
That each debtor may be compelled for the whole, means simply that the debtor who has been sued cannot plead the benefit of division. Hoefly, 418 So.2d at 578. In the instant case, Pear and Allstate are both liable for the same debt and neither has the right to plead the benefit of division. The fact that Allstate has different liability limits is not a relevant factor. Therefore, we find that the suit against Allstate interrupted prescription against Pear without limitation.
In addition to the technical legal reasons for reaching this result pursuant to Hoefly and Williams, we also note that as a purely practical matter Pear suffers no prejudice in a legal sense from the application without limitation of the principles of solidary liability. His defense is no different whether he is liable for $100,000.00, $500,000.00, or $1,000,000.00. The claim is no more or less stale (which is one of the things prescription is intended to address) whether Pear is liable for $100,000.00 or for an unlimited amount. Pear's witnesses and evidence would be the same regardless. "In for a penny, in for a pound," accurately describes Pear's position in this case.
James Pear contends that the subrogation claim of the trucking company interests is barred by the authority of Singleton v. Kindler, 399 So.2d 1313 (La.App. 4 Cir.1981). Singleton involved the interpretation of some peculiarities of Uninsured Motorist statutory law not relevant to this case. Moreover, this Court noted in Singleton, 399 So.2d at 1316 that:
[A]merican Fidelity as the UM carrier was not bound with Kindler and Allstate because it could not be liable until the policy limits on the Allstate policy had been exhausted. Hence, Louisiana Civil Code Article 2161(3) is not applicable.
No one has contended that a similar situation exists in this case.
LSA-C.C. art. 2161(3) as it existed at the time this Court decided Singleton provided that legal subrogation took place of right:
3. For the benefit of him who, being bound with others, or for others, for the payment of the debt, had an interest in discharging it.
This Court stated in Singleton:

Here American Fidelity and Singleton entered into an agreement with LeBeauf, one of the guest passengers, wherein the latter received a sum of money in exchange for the complete release of the former. Thus, the release was for the benefit of American Fidelity and Singleton and not for the benefit of the other debtors, namely the defendants Kindler and Allstate. [Emphasis added.]
Id.
This statement seems to imply that payments under LSA-C.C. art. 2161(3) must not be for the benefit of the party making the payment if subrogation is to apply, whereas Article 2161(3) appears to state that subrogation does run in favor of the party making the payment. Indeed, to suggest otherwise would turn subrogation on its head. We must either assume that there is an unintentional error in the wording of Singleton, or we must call that opinion into question. However, it is not necessary that this panel attempt to overrule Singleton as it is distinguishable on its facts as has already been explained.
Moreover, LSA-C.C. art. 2161(3) was replaced in 1989 with LSA-C.C. art. 1829(3) which declares that legal subrogation takes place:

*898 (3) In favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of payment. [Emphasis added.]
This new language in 1829(3) eliminates any confusion that may have been engendered by the reference to "benefit" in old LSA-C.C. art. 2161(3), and, when read in conjunction with LSA-C.C. art. 1805 makes it clear that the procedures employed by the trucking company interests in settling this case entitle them to contribution.
Finally, we note that Singleton was decided prior to the Supreme Court decisions in Hoefly and Williams. Therefore, to the extent that Singleton conflicts with those two decisions, it may be considered to be implicitly overruled.

II. THE TRIAL COURT DID NOT ERR IN FAILING TO INFORM THE JURY OF THE ALIGNMENT OF THE PARTIES FOLLOWING THE SETTLEMENT
Allstate asserts as error the failure of the trial judge to inform the jury of the realignment of the parties following the settlement. As a result the trucking company interests were permitted to proceed in what amounted to the dual capacities of plaintiff and defendant. Allstate contends that ultimately the jury was mislead to such an extent so as to be prevented from doing justice. In a similar situation, the court in Ducote v. Commercial Union Ins. Co., supra, 616 So.2d at 1372, sustained the discretion of the trial court in its decision not to allow evidence and explanation of the settlement to be presented to the jury. The Ducote court felt that evidence of the compromise would prejudice the jury on the issue of negligence and concluded that:
Considering the importance of a definitive determination of percentages of fault, we cannot say the trial judge abused his discretion in excluding the evidence.
LSA-C.E. art. 403 states that even relevant evidence may be excluded if its probative value is outweighed by its prejudicial effect, or if it confuses or misleads the jury. LSA-C.E. art. 408 specifically declares that evidence of a compromise is not admissible to prove liability, and historically it has long been recognized that evidence of a compromise tends to have a prejudicial effect on the question of liability regardless of the purported reasons for attempting to get such evidence before the jury. The judge in his hearing on the motion in limine stated he was not going to inform the jury of the compromise because it would "taint" them on the issue of negligence.
James Pear's brief cites Stockstill v. C.F. Indus., Inc., 94-2072 p. 8-12 (La.App. 1 Cir. 12/15/95), 665 So.2d 802, 811-813, writ den. 96-0149 (La.3/15/96), 669 So.2d 428, for the proposition that it was error for the trial judge to fail to inform the jury of the settlement and realignment of the parties. Stockstill is inapposite. In Stockstill the settling parties retained a financial stake in the outcome of the litigation, i.e., as a result of the terms of the settlement, the settling defendant in Stockstill stood to profit financially from the success of the plaintiff, its former adversary. Stockstill acknowledged that evidence of the compromise was admissible to prove witness bias, but even then the amount paid would not be admissible, even to prove bias. The question of witness bias does not arise in regards to the settlement in the instant case. The settling guest passengers retained no financial stake in the outcome of the litigation. The amount of their ultimate total recovery was in no way contingent upon the success of the trucking company interests at trial. In any event, the testimony of the guest passengers was virtually worthless regarding the issue of liability. They all admitted to dozing off at the time of the accident. The purpose of their testimony was really to quantify damages, not to establish liability. Therefore, neither Allstate nor James Pear can show that they suffered any material prejudice as a result of guest passenger bias, even if we were to assume for purposes of argument that such bias existed.
Ultimately, the trial judge was forced to make the difficult judgment call of whether it would be more prejudicial to allow the case to proceed with the appearance that the guest passengers were still parties in interest, or would the disclosure of the settlement be more prejudicial. Based on the historical *899 recognition of the prejudicial nature of settlement information on the minds of the jurors, we find no abuse of the trial court's discretion in proceeding as he did, especially in view of the fact that the jury was fully informed of the fact, favorable to Mr. Pear, that the guest passengers continued to allow Mr. Pear to drive them to work after this accident. The procedure employed by the trial judge, though awkward at times, did not prejudice the jury verdict.
Accordingly, we find no error in the refusal of the trial court to inform the jury of the realignment of the parties.

III. THE JURY'S FINDINGS OF FAULT
Allstate asserts that there is no evidence that James Pear was at fault. Kevin Perrier testified that there was no damage or paint transfer when he examined the tractor trailer on the right front bumper, right front fender, lug nuts or wheel. This would allow the jury to reasonably conclude that the accident was not caused by the tractor trailer striking the Mazda as alleged by James Pear and Allstate. Mr. Perrier's testimony is consistent with the theory of causation suggested by the trucking company interests, i.e., James Pear was inattentive and initially crashed into the guard rail.
Mr. Price testified that there was no contact damage on the driver's side right fender, right bumper, right wheel, or right lug nuts containing red paint from James Pear's Mazda. Correspondingly, Mr. Price also testified that there was no gray or black paint from the truck on the Mazda. Mr. Price's testimony is, therefore, consistent with the testimony of Mr. Perrier.
Mr. Price went on to testify that there was some evidence of paint transfer on the left side of the trailer. Such paint transfer would be consistent with the Mazda striking the left side of the truck after ricocheting off of the retaining wall in accordance with the trucking company interests' theory of causation.
All of the guest passengers admit that they were dozing at the time of the accident. None could give any reliable testimony regarding the manner in which the accident occurred.
Bob Hatten was driving a following vehicle. Like James Pear he is a Chevron employee. However, he did not know James Pear. On the other hand, he had no reason to be biased in favor of the trucking interests or against James Pear. He testified that he first saw the 18-wheeler when he "realized that the car had ricochetted into its path." Mr. Hatten went on to testify that the truck was not involved with any prior impact with the Mazda that he could see, and there was nothing obscuring his vision. Mr. Hatten testified that the truck was in the right lane.
Howard Dufour testified that the truck was in the left lane. He saw the car go out of control when the truck moved from the left lane to the center lane, implying that the car's loss of control may have resulted from being struck by the truck when the truck changed lanes. However, he did not see the truck strike the car. There were inconsistencies and uncertainties in his testimony which probably accounts for the failure of the jury to be persuaded by it.
Officer Sandifer of the police department noted light damage on the right front bumper of the 18-wheeler on his police report and issued a ticket to the driver of the 18-wheeler for improper lane usage. Officer Sandifer testified that there were skid marks at the accident scene, but on his police report he showed none on the diagram and he put, "none." He explained at trial that this did not mean that there were no tiremarks, only that he noted none. This, and other suggestions of inconsistency in the testimony of Officer Sandifer prevent us from concluding that the jury was unreasonable in giving it little or no weight, preferring instead to draw other reasonable inferences and conclusions from the evidence. We cannot say that the members of the jury were manifestly erroneous in concluding, as they must have, that Roosevelt C. Samuels' explanation of why he did not contest a ticket which charged him with an offense he did not commit,[14] was *900 more reasonable than Officer Sandifer's explanation of why he felt justified in giving Mr. Samuels the ticket for improper lane usage.
Olin Dart's expert opinion that the truck first struck the Mazda was based on the premise that the truck did so by moving from the left lane to the center lane. As there was no physical evidence to support this conclusion, he was forced to rely on the deposition testimony of the two eyewitness drivers of following vehicles, Messers. Dufour and Hatten. Mr. Hatten's testimony does not support that conclusion, and although Mr. Dart interpreted Mr. Dufour's testimony as stating that the accident occurred when the truck changed lanes, Mr. Dufour's precise deposition testimony was:
No, like I said, the first time I noticed something was wrong was when I seen the trailer lights come on and then you know, he was in the left lane and it looked like he was moving to the right.
This was a reference to the tractor trailer brake lights coming on at the moment of impact, which, according to this testimony quoted from Mr. Dufour occurred while the truck was in the left lane. Mr. Dart hedged his testimony by suggesting that Roosevelt Samuels said that his front right wheels might have gotten near the line. Essentially, Mr. Dart's reconstruction is no better than Mr. Dufour's testimony which was not supportive at the time he was deposed and was inconclusive and inconsistent at the time of trial. As the jury evidently was unconvinced by Mr. Dufour's version of the accident, is it any wonder that they rejected the accident theory of the expert which was based on Mr. Dufour's testimony?
Mr. Clayton Daniel, Choctaw's equipment manager testified that the rear tire on the driver's side of the tractor trailer had a scrape on it and the chassis on that side had some fresh scratches on it.
Philip Nolan, safety director at Choctaw testified that: "The only sign of contact that I could find on the tractor was the left rear pull wheel, which is the driver's side."
Although Allstate and James Pear contend that there is no evidence that James Pear caused the accident, neither suggest that the accident occurred through the fault of a phantom driver, road conditions, weather conditions, or faulty vehicle equipment or design. The jury could only conclude that the accident was caused by either the truck or the Mazda, or that both contributed to the accident in some proportion. No one contends that there was an outside third cause. Therefore, not only is the jury entitled to rely on evidence that the Mazda (James Pear) is at fault, it is also entitled to rely on evidence that the truck (Roosevelt Samuels) is not at fault, from which the jury may then draw the reasonable inference that to whatever extent Mr. Samuels is not at fault, whether in whole or in part, Mr. Pear must be.
Accordingly, we find no manifest error in the jury finding that James Pear was solely at fault in causing this accident.

IV. THE TRUCKING COMPANY INTERESTS' ANIMATED VIDEOTAPE
Allstate complains that the trial court erred in allowing the trucking interests to introduce a videotape recreation of the accident which admittedly did not conform to the laws of physics or mathematics. In effect the videotape was a series of diagrams given the effect of animation by being played sequentially in rapid succession. The video was designed to illustrate the opinion of the trucking company interests' expert on accident reconstruction on the placement of the vehicles during the course of the accident. The expert explained that the tape was an animation not a simulation and was not done in real time. Effectively, the animation was no different than if the expert had created a series of many diagrams and explained that, "First the vehicles were here, then they were here, and finally, here." The creation of the *901 video and its limitations were explained in great detail under cross-examination for the benefit of the jury. It was made completely clear that this computer animation was not the result of computer calculations recreating the accident, but was instead a series of pictures illustrating the opinion of the expert rather than having him draw his own diagrams to illustrate his points. To put it another way, it was made abundantly clear to the jury that the video did not represent computer support and confirmation of the expert's opinion, but was merely a means of illustrating the opinion of the expert. The animation was more of a labor saving device than anything else. In essence, it saved the expert the trouble of drawing his own diagrams by hand. It was clearly explained to the jury that the vehicles were shown in the animation at locations specified by the expert just as if he had drawn them in arbitrarily, rather than necessarily being shown where the laws of physical science would indicate that they should be. The jury was also informed that the animation was not done in real time.
The animation was done to scale and therefore does not represent a physical distortion of the accident location that might be unduly prejudicial. It was made clear to the jury that the videotape reenactment of the accident was only as good as the expert opinion which it was designed to illustrate.
In Pino v. Gauthier, 633 So.2d 638 (La. App. 1 Cir.1993), writ den. 94-0243 (La.3/18/94), 634 So.2d 858, the court sustained the exclusion of a videotape of an automobile accident. But the videotape in Pino was a computer simulation, not a computer animation. In the instant case the expert took great pains to explain that in a computer simulation the computer uses software theoretically applying the laws of physics in an attempt to realistically recreate the accident. In a simulation the computer functions in a sense as an expert itself, rendering its own opinion based on internal calculations of how the accident would have occurred. A court might feel that a jury of laypersons would be unduly impressed, influenced, and intimidated by a computer simulation. The animation in this case is not clothed in the exaggerated aura of computer infallibility (much like the emperor's new clothes), an aura that fails to take into account not only the well known computer adage, "garbage in, garbage out," but also may fail to take into account the limitations and deficiencies of the simulation software, which would involve an analysis perhaps best avoided by juries where possible. It was admitted at the outset that the emperor, in this case the emperor being the videotape animation, had no clothes. There was no attempt to represent the animation to be anything more than it was. It was very brief and was unlikely to have assumed an exaggerated or disproportionate prominence in the minds of the jury. The use of the videotape animation was not unduly prejudicial. The decision to allow its use did not constitute an abuse of the trial court's discretion.
The admission of a videotape is largely within the discretion of the trial judge. Lafleur v. John Deere Co., 491 So.2d 624, 632 (La.1986); U.S. Fidelity and Guaranty Co. v. Hi-Tower Concrete Pumping Service, Inc., 574 So.2d 424, 438 (La.App. 2 Cir.), writ denied, 578 So.2d 136, 137 (La. 1991). Determination of the admissibility into evidence of videotapes must be done on a case by case basis depending on the individual facts and circumstances of each case.
In Malbrough v. Wallace, 594 So.2d 428 (La.App. 1 Cir.1991), writ den. 596 So.2d 196 (La.1992), the appellate court sustained the trial court refusal to admit a videotape into evidence. However, the videotape in that case bears no relationship to the videotape in the instant case. The videotape in Malbrough was 55 minutes long, was found to be repetitive and of very little probative value. In effect, its worth was far exceeded by its length and it could be expected, therefore, to assume a prominence in the minds of the jury greatly disproportionate to its probative value, which is another way of saying that its admission would have been prejudicial. As the Malbrough court noted where the only proper question to be addressed was the existence of plaintiff's ruptured disks:
Much of the material shown on this videotape, such as the cutting of plaintiff's fat, the smoke rising from her muscles as they *902 were cauterized, and the removal of gory packing material from the wound, served no purpose other than to inflame and prejudice the jury. Had the videotape been restricted to only the portion showing the abnormal disks, our opinion might be different. [Emphasis added.]

Malbrough, 594 So.2d at 432.

V. SPOLIATION OF EVIDENCE AND THE MISSING BUMPER
Allstate asserts that it was error for the trial court to refuse Allstate's request to instruct the jury on the adverse presumption rule on spoliation of evidence in connection with Choctaw's discarding of the bumper of the 18-wheeler. The truck was photographed extensively and investigated in the weeks following the accident. Allstate complains that the bumper photographs should have been clearer and more close-up. Although the photographs might have been better, they are more than adequate to demonstrate that the trucking interests were not trying to hide the bumper. During this period of time neither Allstate nor Mr. Pear made any attempt to examine the truck or the bumper. Mr. Debose testified that the bumper was changed sometime between October of 1995 and six months prior to that time. The accident occurred in August of 1993. Therefore, the bumper was available for inspection for at least something in excess of a year and a half and perhaps more than two years. During this period of time the truck and bumper were in use for hundreds of thousands of miles. Eventually the bumper was replaced in the normal course of maintenance.
The cases cited by Allstate indicate apply the adverse presumption rule should only apply to situations in which the evidence was destroyed or discarded with no remaining photographs under conditions from which one could infer that the party disposing of the evidence was motivated by a desire to dispose of unfavorable evidence. There is nothing in the way that Choctaw dealt with this bumper from which we might infer that the disposition of the bumper was motivated by a desire to deprive other litigants of access to it. The theory of spoliation of evidence refers to an intentional destruction of the evidence for the purpose of depriving the opposing parties of its use. Randolph v. General Motors Corp., 93-1983 p. 12 (La.App. 1 Cir. 11/10/94), 646 So.2d 1019, 1027. Furthermore, the presumption that evidence which a litigant fails to produce is detrimental to his case, is not applicable when the failure to produce the evidence is adequately explained. The explanation for the disposition of the bumper furnished by Choctaw's Mr. Debose is adequate and is supported by corroborating circumstances, i.e., the long delay in disposing of the bumper and the fact that it had been extensively photographed prior to its disposition.
Allstate and James Pear are not entitled to the benefits of the doctrine of spoliation of evidence in this case.

VI. THE AMENDED JUDGMENTS
The trial court rendered judgment on November 18, 1996, in accordance with the jury verdict. That judgment found Allstate and its insured, James Pear, solidarily liable to the trucking company interests in the amount of $744,860.37 plus costs and certain expert fees. Allstate and James pear filed a "Motion To Vacate Judgment, Motion For New Trial And/Or Alternatively Judgment Not Withstanding The Verdict" which was fixed for hearing on December 13, 1996. At the December 13, 1996 hearing the trial judge stated:
For the record, the court is denying the motions for new trial, the motions for JNOV, ordering that the judgment be restructured to reflect the Court's understanding of the jury's verdict, which the verdict, of course, will be attached to the judgment, the verdict being, finding that Mr. Pear was responsible for the accident, that Allstate's limits in this case is $100,000.
* * * * * *
The Court's specific intention is that the judgment reflects the Court's belief that the Choctaw interests are allowed to collect that $100,000 from Allstate only and have no rights to proceed against Mr. Pear individually.
The trial court then signed an Amended Judgment dated December 17, 1996 dismissing *903 all claims against James Pear and reducing the judgment against Allstate to $100,000.00 plus interests, all costs, and certain experts' fees.
Then, without further hearing, on December 23, 1996, the trial court rendered a second Amended Judgment. The only change made by this second amended judgment appears to be in the last line of the fourth full paragraph on the second page where the word "his" is found in the first amended judgment and the word "their" is found in the second amended judgment. The effect of this change would be to shift some costs ("his cost") from James Pear to the trucking company interests ("their costs"). Other than this minor change the second amended judgment is identical to the first amended judgment.
There is considerable dispute among the parties about the procedural propriety of the rendering of the amended judgments by the trial court, especially in view of the fact that the trial judge specifically stated that he was denying the motions for a new trial and JNOV. This poses a technical problem because in the absence of such motions the trial judge did not have the authority to amend the judgment in the manner in which he did. However, as we consider all of the judgments to be before us on this appeal and as the record is complete, we can render judgment in this case without having to sort out all of arguments surrounding the procedural sequence of events surrounding the three judgments.
In any event, regardless of whether the trial judge misspoke when he said he was denying all motions, his actions speak louder than his words. He held a hearing in connection with the motion for a new trial, etc., and had jurisdictional authority at that time to amend the judgment, which he did.
The second amended judgment poses more of a problem, because there were no pending motions for new trial which would justify it. LSA-C.C.P. art.1951 does not permit amendments of substance unless they are for the purpose of correcting errors of calculation. Nor does this Court believe that the jurisdiction retained by the trial court to "set and tax costs and expert witness fees" pursuant to LSA-C.C.P. art.2088(10) is authority for the trial court to alter an award of costs once made in a final judgment. The trial court only retains jurisdiction to set and tax costs and expert witness fees not already set and taxed. For example, had the trial court noted that there were still the fees of three expert witnesses unaccounted for after the rendition of the first amended judgment, the trial court would presumably retain jurisdiction under LSA-C.C.P. art.2088(10) to set and tax those expert witness fees. The reallocation of costs in the second amended judgment is an amendment of substance not intended to correct an error of calculation and not authorized by LSA-C.C.P. art.2088(10). Therefore, it is void. State v. Star Enterprise, 95-2124 (La.App. 4 Cir. 8/7/96), 691 So.2d 1221, affirmed by State v. BP Exploration & Oil, Inc., 96-0716 (La.1/14/97), 686 So.2d 823.
The alteration made by the second amended judgment occurs in the paragraph dismissing the trucking company interests' "cross claim/third party demand" against James Pear. As we are reversing the trial court's decision to dismiss this claim for reasons set forth in this decision, we would reverse the taxing of costs in connection with "cross claim/third party demand" for substantive rather than procedural reasons. In other words, we would overturn the reallocation of costs found in the second amended judgment regardless of the procedural validity of that second amended judgment.

THE TRUCKING INTERESTS MOTION FOR PARTIAL NEW TRIAL LIMITED TO PENALTIES PURSUANT TO LSA-R.S. 22:1220
The trucking company interests filed a motion for partial new trial seeking penalties under LSA-R.S. 22:1220 for the arbitrary and capricious refusal of Allstate to pursue settlement negotiations in good faith. The trucking interests failed to brief this issue. Therefore, it is deemed abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.

THE SETTLEMENT AGREEMENTS BETWEEN THE GUEST PASSENGERS AND THE TRUCKING COMPANY INTERESTS WERE IN EVIDENCE
James Pear contends that the settlement documents were not in evidence. The trial *904 judge said that the settlement documents would "be in the record," but that they could not be shown to the jury because of the risk of improperly influencing the jury:
It's okay. If it's not going to the jury, it can't influence them. The Court of Appeals will have it when y'all get there, and won't have to send y'all back to have it introduced. So it can go in. Just no one's gonna sneak it to the jury.
This raises two questions: (1) Were the settlement documents introduced into evidence but not shown to the jury? (2) Does the trial judge have the authority to receive anything into evidence without showing it to the jury?
The answer to both of these questions is, "Yes." There is no dispute that the claims of the guest passengers were settled. Both the James Pear and Allstate briefs even set forth the amounts of the settlements. Allstate in its original brief argued that: "The settlement documents release and forever discharged only the Trucking Company Interests and their insurers." In a subsequent brief, Allstate argued the contents of the settlements in even greater detail. James Pear's original brief raises arguments concerning the content of the settlement agreements. It is only in James Pear's reply brief that it is suggested for the first time that this Court could not consider the wording of the agreements because they were not in evidence. Up until the time of the filing of James Pear's reply brief, the actions of the trial judge and all parties were consistent with a finding that the judge received the settlement documents into evidence, but would not allow them to go before the jury because of the potential for prejudice as discussed elsewhere in that portion of this opinion devoted to reviewing the propriety of the trial judge's decision not to inform the jury of the settlement. We, therefore, find that the trial judge allowed the settlement documents into evidence "for his eyes only" so that he might consider their effect.
We find no error in this procedure. The potential for prejudice on juries of settlement evidence is hornbook law. The effect of the settlements in this case is a matter of law. Matters of law do not fall within the province of the jury. There is no disagreement in this case about what the settlement documents state. No one has suggested that the copies of the settlement documents are not authentic. The only disagreement concerns the legal effect to be given to those documents. Under the circumstances, we find no fault in the manner in which the trial court dealt with those documents.

DECREE
For the foregoing reasons we render judgment in favor of Choctaw Transport, Inc., Debose Trucking Company, Inc., Roosevelt C. Samuels and Northern Assurance Company of America, and against Allstate Insurance Company and James Pear, jointly and in solido, in the amount of FIVE HUNDRED FORTY-ONE THOUSAND AND ONE DOLLAR AND FIFTYFOUR CENTS ($541,001.54), together with judicial interests from the date of judicial demand until paid and all costs of these proceedings, together with experts' fees in the following amounts: Steve Irwin$350.00; Kirk Parks$300.00; Dr. Jorge Sanchez $500.00; and Dr. Charles Krieger$500.00. All other portions of the judgments rendered below are reversed, with the exception of the dismissal of the intervention Ochsner/Sisters of Charity Health Plan, Inc. which is not before this Court at this time.
AFFIRMED AND AMENDED IN PART REVERSED IN PART AND RENDERED.

ORDER
ON REHEARING GRANTED.
Considering the motions for rehearing of Allstate Insurance Company and James Pear we grant rehearing and amend the decree of our original judgment to recognize that Allstate Insurance Company's liability, although solidary with its insured, James Pear, is limited by its policy limits of $100,000.00. In all other respects we reaffirm our original opinion and decree.
NOTES
[1] This claim may be referred to as the "Constans claim."
[2] Referred to herein collectively as the "trucking company interests" from time to time.
[3] The tractor portion of the unit was owned by Debose Trucking Company, Inc, and leased to Choctaw Transport, Inc.
[4] Ochsner/Sisters of Charity Health Plan, Inc. intervened for reimbursement of medical expenses and Westchester Fire Insurance Company was named as a defendant as the umbrella liability insurer of the trucking company interests. Neither are involved in this appeal.
[5] The jury interrogatories asked provided for the quantification of Pear's damages because of the possibility that he might not be found solely at fault as he was. The quantification of Pear's damages by the jury was not an indication that the jury felt that the trucking company interests were at least partially at fault which would mean that the jury verdict would contain irreconcilable inconsistencies.
[6] We do not mean to imply that there was any insincerity in the efforts of James Pear to defend this case. It was vigorously defended.
[7] "THIS IS NOT A PARTIAL RELEASE AND THE UNDERSIGNED UNDERSTANDS THAT NO CLAIMS ARE RESERVED AND ALL RESPONSIBLE PARTIES AND ENTITIES ARE RELEASED." Illinois Central, 581 So.2d at 716.
[8] "Deaton was not an obligor after Prescott released it from all claims. Thus IC has no right of subrogation against Deaton." Illinois Central, 581 So.2d at 716.
[9] The substance of this article is now incorporated in LSA-C.C. art. 1804.
[10] Allstate and Pear would read the phrase "pays the whole debt" found in former LSA-C.C. art. 2104 and "rendered the whole performance" so narrowly and literally that a solidary debtor whose virile portion is only 50%, but who pays 90% of the solidary co-debt could not claim contribution from his co-debtor for that 40% portion of the co-debt that rightfully formed part of the 50% virile share of the co-debtor. Allstate and Pear would require that the debtor pay 100% of the debt before he would be entitled to any contribution from his co-debtor. Although it seems reasonable that to require that the debt be satisfied in full before the debtor should be able to collect from the co-debtor, i.e., the creditor's right to be paid in full should take precedence over the right of solidary contribution, it should not mean that a debtor who pays more than his virile share should not ultimately have the right to claim contribution from his solidary co-debtor.
[11] "Deaton was not an obligor after Prescott released it from all claims. Thus IC has no right of subrogation against Deaton." Illinois Central, 581 So.2d at 716.
[12] This panel feels that this Court's reading of the settlement in Illinois Central was perhaps unduly technical and placed too much emphasis on form over substance. This panel does not feel that the full release language in the Illinois Central settlement document was intended as a stipulation puor autrui for the benefit of the joint tortfeasors who were not a party to the settlement and should not have been a bar to recovery from them via contribution of their virile share. The purpose of the settlement was to satisfy in full the claim of the injured tort victim, not the release of non-signatory joint tortfeasors who should not have been entitled to demand the benefit of what appears to be no more than the unfortunate use of boiler-plate broad release language. This panel prefers the result reached by the Third Circuit in Ducote v. Commercial Union Ins. Co., 616 So.2d 1366, 1370 (La.App. 3 Cir.), 620 So.2d 877 (La.1993), where more emphasis was placed on the intent of the parties to the settlement document.

However, this panel does not have the authority to overrule this Court's decision in Illinois Central, and as will be explained later in this opinion, it is not necessary that we do so.
[13] This Court stated that:

In the instant case, Deaton has been enriched because it was released from its liability for its negligent injuring of Prescott. IC has been impoverished because it paid for Prescott's injury although it was not actually at fault in causing that injury. The enrichment and the impoverishment are interconnected by the accident and the negotiation of the release. [Emphasis added.]
Illinois Central, 581 So.2d at 717.
This panel would have found no impoverishment of IC because IC got all that it bargained for in the settlement with Prescott, a full release from liability which is full consideration for the payment it made. The Tulane Law Review authorities cited in Illinois Central do not support the propositions for which they are cited. None involve a settlement of a legal claim. Additionally, we note that 50 Tul.L.Rev. at 904 states that unjust [emphasis original] enrichment occurs when an economic benefit [footnote omitted] is added to one patrimony to the economic detriment [footnote omitted] of another patrimony, either directly or through an intervening party, without the corresponding transfer of an adequate compensation. [Emphasis added.]" The release of liability obtained by IC is "adequate compensation."
Likewise, in 36 Tul.L.Rev. at 632 the commenter notes that:
[I]n the situation considered here where the defendant is enriched as a result of the performance by the plaintiff of a contract with a third party and that third party had not fulfilled his side of the contract, the plaintiff can claim that his impoverishment and therefore the defendant's enrichment is without legal justification. [Emphasis added.]
The "third party" referred to by the commenter in the language highlighted in the preceding quote would be the guest passengers in the instant case. But in the instant case the guest passengers fulfilled their side of the contract by granting the trucking company interests a full release.
51 Tul.L.Rev. 446, 456 fails to even consider the issue of contribution based on solidary liability.
Where a settlement (transaction or compromise) is involved, the amount of the payment relative to the amount of the claim is not the consideration for the settlement. Lesion is no basis for attacking a settlement or compromise. LSA-C.C. art. 3078. The consideration for a settlement or compromise is the termination or prevention of litigation whereby the hope of gaining is balanced by the danger of losing. Therefore, regardless of whether we find that there was no unjust enrichment because the trucking company interests having received full consideration for the settlement with the guest passengers in the form of the release of liability cannot be considered to have been impoverished; or we find that the settlement is legal justification for the impoverishment of the trucking company interests, the result is the samethere is no unjust enrichment arising out of the settlement. Fortunately for the trucking company interests as explained elsewhere in this opinion, there is no need for the trucking company interests to rely on the theory of unjust enrichment in order to recover from James Pear and Allstate.
[14] The record of Mr. Samuel's testimony makes him appear to be very credible. We can only imagine that his live appearance on the stand was even more impressive. Mr. Samuel explained that he paid the ticket only because he is based out of state and it did not seem worth the hassle of coming all the way to Louisiana to contest the ticket when his employer was willing to pay it for him. We cannot say that the jury was manifestly erroneous in accepting this explanation.